

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

WILLIAM O. HUGGINS, III,
**Plaintiff,**

-vs-

**Case No.  A-14-CA-1058-SS**

ROYALTY CLEARINGHOUSE, LTD.,
**Defendant.**

# O R D E R

BE IT REMEMBERED on the 29th day of May 2015, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel.  Before the Court are Plaintiff William O. Huggins's Motion for Partial Summary Judgment [#24], Defendant Royalty Clearinghouse, Ltd.'s Response [#27] thereto, Plaintiff's Reply [#28] thereto, Defendant's Motion for Summary Judgment [#30], Plaintiff's Response [#32] thereto, and Defendant's Reply [#33] thereto.  Having considered the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

## Background

This case arises from an eight-year-old oil and gas transaction evidenced by a "Mineral and Royalty Deed" (the Deed) executed by Plaintiff William O. Huggins in favor of Defendant Royalty Clearinghouse, Ltd. (RCH), an oil and gas property management and acquisition company.  The parties dispute both whether the Deed successfully conveyed anything from Huggins to RCH and, if it did, what type of interests were actually conveyed: both Huggins and RCH claim ownership of the mineral estate and the royalty interests associated with the land involved in their transaction.

The pertinent facts are as follows.  As of August 1990, Huggins was the owner of 36.25% of 100% of all minerals contained in certain tracts of land located in the Alfred Kennon Survey, A-32, Burleson County, Texas.  As will later become relevant, while Huggins originally owned both the surface estate and the mineral estate in the tracts, Huggins severed the two in the mid-1970s by selling the surface acreage to one H.R. Anderson.

In late 1990 and 1991, Huggins leased most of the mineral estate to Union Pacific Resources Company, an oil and gas exploration company.  After executing the leases, Union Pacific began to produce minerals on each of three pooled units encompassing the leased tracts: the See–Huggins Unit, the See–Yegua Unit, and the Yegua–Yegua Unit (together, the Units).  Under the Union Pacific leases, Huggins was entitled to royalties from production of minerals on the tracts and held a possibility of reverter in those tracts were they to cease producing.

On October 12, 2007, RCH sent Huggins a letter offering to buy his "oil and gas mineral interests" in the See–Huggins Unit and Yegua–Yegua Unit for $47,670.51.  *See* Def.'s Mot. Summ. J. [#30-10] Ex. B-17 at 56, 57.  No mention was made of the See–Yegua Unit.  *See id.*  Following additional correspondence, however, on November 14, 2007, Huggins sent RCH a letter stating as follows:

> Pursuant to our conversation by telephone today, I accept the offer of [RCH] to purchase my oil and gas interest located in the Alfred Kennon League Survey, A-32, Burleson County, Texas for a net sum of Sixty-Six Thousand and No/100's Dollars ($66,000.00). . . .
>
> I have attached the Division Orders on the Yegua–Yegua A-1 RE and the See–Yegua Unit A #1 RE, but have not been able to locate the Division Order covering the See-Huggins Unit.  You will have to get that one somewhere else.

*Id.* Ex. B-19 at 63.  Two days later, on November 16, 2007, RCH sent Huggins a letter thanking him

"for accepting our offer to purchase your royalty interest in Burleson County, Texas," along with a

check for the full purchase price[1] and a copy of the deed for Huggins's signature.  *See id.* Ex. B-20

at 74–75; *see id.* [#30-2] Ex. A-2 (Deed).

On November 21, 2007, Huggins contacted RCH requesting the insertion of additional

language into the Deed which made clear Huggins's undivided one-half interest in all "hard-core

minerals," including coal, was not transferred to RCH by the conveyance.  *See id.* Ex. B-21 at 80.

RCH inserted the additional language and returned the Deed to Huggins for signature.  *See id.* Ex.

B-22 at 82.  The Deed contains the following granting language, key to the parties' dispute, which

purports to convey:

> all of [Huggins]'s right, title, and interest in and to all of the oil, gas and other
> minerals, oil royalty, gas royalty . . . and royalty in all other minerals of any kind or
> character SAVE AND EXCEPT, there is hereby reserved unto [Huggins] . . . an
> undivided one-half (½) of all hard-core minerals, including, but not limited to, lignite
> coal . . . in, under and that may be produced, saved and marketed from the following
> described land:
>
> > All of the lots, tracts, or parcels of land owned by Grantor in the
> > Alfred Kennon Survey, A-32, Burleson County, Texas[.]

Deed at 2.  The Deed further provides:

> in the event an existing oil, gas and mineral lease . . . for any reason becomes
> terminated, canceled or forfeited, then in that event, [RCH] . . . shall own all of
> [Huggins]'s right, title and interest in and to all of the oil, gas and other minerals in,
> under and that may be produced, saved and marketed from the Subject Land, together
> with a like interest in and to all bonuses paid and royalties and rentals provided for
> in future leases covering the Subject Land.

*Id.*

---

[1] Less Huggins's share of outstanding property taxes.  *See* Def.'s Mot. Summ. J. [#30-10] Ex. B-20 at 74.

On December 3, 2007, Huggins sent RCH a letter confirming he had executed the Deed and stating it was his "understand[ing] from our agreement and the Deed that [RCH] will collect royalties from this sale beginning with the November, 2007 production." Huggins's letter further indicated that "[i]n the event I receive any royalties from production from November and succeeding months, I will forward to [RCH]." *Id.* [#30-11] Ex. B-23 at 2.

On March 13, 2008, EnerVest, the company then operating the Units, sent Huggins a transfer order "reflecting the transfer of [Huggins's] *partial* interest" in the Units. *See id.* [#30-11] Ex. B-24 at 4 (emphasis added). Specifically, despite the deed language conveying "*all* of [Huggins's] right, title and interest" in the royalties associated with production on the Units, the transfer order indicated Huggins had transferred to RCH only half of his royalty interest in the Units. *See id.* at 7. Both Huggins and RCH, however, executed the transfer order, returned it to EnerVest, and thereafter each began to receive half-interest royalty payments associated with production on the Units. *Id.* [#30-9] Ex. B (Huggins Dep.) at 38:11–15; 41:22–42:3. Huggins retained the half-interest royalty payments and paid property taxes on them. *See id.*

On September 17, 2008, RCH sent Huggins a letter requesting reimbursement of the half-interest royalty payments Huggins received in November and December 2007. *Id.* [#30-11] Ex. B-28 at 55. The letter indicated that in November 2007, RCH had "purchased [Huggins's] royalty interest in Burleson County," explained EnerVest had informed RCH of a possible error in the royalty payments, and asked Huggins to repay any royalties he was erroneously paid. *Id.* A little over a month later, on October 28, 2008, Huggins sent RCH an email stating he had recently been ill, suggesting RCH's attempts to contact him had been unsuccessful, and asking RCH send any

correspondence by regular mail.[2] *Id.* Ex. B-29 at 57.  RCH sent a second request for reimbursement by regular mail on October 31, 2008.  *Id.* Ex. B-30 at 59.

Huggins took no action after receiving the October 31, 2008 request for reimbursement.  The next communication between RCH and Huggins reflected in the record took place on May 12, 2009, when RCH sent Huggins a third letter requesting reimbursement for the November and December 2007 royalty payments and informing Huggins if he failed to respond by June 1, 2009, the matter would be turned over to RCH's attorney.  *Id.* Ex. B-31 at 61.  Huggins responded on May 14, 2009, confirming he had received the November and December 2007 royalties, noting he paid taxes on them in 2008, and telling RCH to "do your calculations [concerning the correct amount owed considering the tax payment] and let me know what you think is fair and I will reimburse your company for the November and December 07 production payments as requested." *Id.*  It is not clear from the record whether RCH ever sent Huggins an accounting, and Huggins did not reimburse RCH for the November and December 2007 payments.

Huggins continued to receive half-interest royalty payments on production associated with the See–Yegua Unit and the See–Huggins Unit until production stopped on those units in September 2010 and June 2012, respectively.  Huggins Dep. at 115:2–5; First Am. Compl. [#18] ¶¶ 30–31.  As

---

[2] The email reads in full:

Angie: Someone from Royalty Clearing House tried to call me the other day.  My phone has been acting up.  It is now fixed.  I prefer email or regular mail to communicate.  I also think your company tried to send me a certified letter a while back.  I have been quite ill for a long time and have been unable to get out much.  The message left me was something about November and December production for 2007.  What I would like you to do is write me a letter (not certified).  You have my correct address.  Explain just what you want.  I will answer it promptly.  You might want to include a copy of your transfer order from Enervest (I never got a copy of that form for my file).  Thanks. Will Huggins

Def.'s Mot. Summ. J. [#30-11] Ex. B-29 at 57.

production continues on the Yegua–Yegua Unit, Huggins is still receiving half-interest royalty payments associated with production on that unit. Huggins Dep. at 115:6–8; First Am. Compl. [#18] ¶ 32.

On August 9, 2013, and again on September 19, 2014, RCH sent Huggins a letter offering to purchase a one-half royalty interest in the Yegua–Yegua Unit. *See* First Am. Compl. [#18-1] Exs. 11, 12 at 37–38, 40–41. Finally, on September 29, 2014, and October 31, 2014, respectively, RCH and Huggins leased their respective mineral interests in the See–Huggins Unit and the See–Yegua Unit to Patriot Investments, LP, an exploration company. *See id.* Exs. 13, 14.

Huggins initiated this action by filing his complaint on November 21, 2014. *See* Compl. [#1]. On March 27, 2015, the Court granted Huggins's motion to file an amended complaint. *See* Order of Mar. 27, 2015 [#17]. Huggins's first amended complaint brings claims for (1) "voidance of deed for insufficient property description in violation of the statute of frauds"; (2) reformation; (3) quiet title; (4) "adverse possession pursuant to the 3 year statute of limitation"; (5) "adverse possession pursuant to the 5 year statute of limitation"; (6) ratification; (7) "termination of royalty interest held by RCH by operation of law"; (8) unjust enrichment; and (9) breach of the covenant of good faith and fair dealing. *See* First Am. Compl. [#18] ¶¶ 47–55. Causes of action (2)–(8) are pled in the alternative. *See id.* RCH answered the first amended complaint and asserted counterclaims for breach of contract and, in the alternative, unjust enrichment. *See* Answer & Countercls. [#26] at 11.

On March 24, 2015, Huggins filed his motion for partial summary judgment, claiming the deed evidencing the transaction between Huggins and RCH violates the statute of frauds and is voidable as a matter of law. *See* Pl.'s Mot. Summ. J. [#24] at 1. RCH filed its cross-motion for

summary judgment on both Huggins's claims and its counterclaims on May 15, 2015. The motions are now ripe for decision.

## Analysis

### I.    Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are

not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.   Application

### A.   Validity of the Deed

Huggins's chief argument in this litigation is that the Deed is void under the statute of frauds because its description of the property conveyed—all of Huggins's interest in the minerals and royalties produced from "[a]ll of the lots, tracts, or parcels of land owned by Grantor in the Alfred Kennon Survey, A-32, Burleson County, Texas"—is insufficient. According to more than a century of Texas law, Huggins is incorrect.

The statute of frauds requires that a writing conveying an interest in real property contain a sufficient description of the property to be conveyed. *Tex. Builders v. Keller*, 928 S.W.2d 479, 481

(Tex. 1996).[3] To be a sufficient description, "'the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty.'" *Id.* (quoting *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972)). Key for present purposes, "[i]t has long been the rule that a deed purporting to convey all lands owned by the grantor in a State or in a named county is sufficient description to effect a conveyance." *Tex. Consol. Oils v. Bartels*, 270 S.W.2d 708, 711 (Tex. Civ. App.—Eastland 1954, writ ref'd) (citing *Pickett v. Bishop*, 223 S.W.2d 222 (Tex. 1949); *Sanderson v. Sanderson*, 109 S.W.2d 744 (Tex. 1937); *Smith v. Westall*, 13 S.W. 540 (Tex. 1890)).

Here, the Deed purports to convey all of Huggins's interest in the minerals (save an undivided one-half interest in all hard-core minerals) and royalties flowing from production of minerals on "all of the lots, tracts, or parcels of land" Huggins owns in a named survey within a named county—specifically, "the Alfred Kennon Survey, A-32, Burleson County, Texas." Deed at 2. As such, the description "is sufficient to reasonably identify the land" and satisfies the statute of frauds. *Bartels*, 270 S.W.2d at 711.

Huggins further claims even if the description itself is sufficient, the Deed conveyed nothing because he "divested himself of any 'lots, tracts, or parcels of land' he might have owned in Burleson County, Texas, when he deeded [them] to H.R. Anderson" in the mid-1970s. Pl.'s Reply [#28] at 4. This argument is unpersuasive. A deed's reference to "land" includes the mineral estate. *See, e.g., Averyt v. Grande, Inc.*, 717 S.W.2d 891, 894 (Tex. 1986) ("Because 'land' includes the surface of the earth and everything over and under it, including minerals in place, a description of land

---

[3] The standard for sufficiency of the description is the same under the statute of conveyances. *See Broaddus v. Grout*, 258 S.W.2d 308, 309 (Tex. 1953).

includes the land and all the minerals naturally existing underneath." (citations omitted)); *Calhoun v. Killian*, 888 S.W.2d 51, 53–54 (Tex. App.—Tyler 1994, writ denied) (devise of "all of the land" included mineral interests); *see also In re Estate of Slaughter*, 305 S.W.3d 804, 808 (Tex. App.—Texarkana 2010, no pet.) ("All land in Texas is comprised of separate corporeal estates in the minerals and in the surface."). Consequently, severing the surface estate from the mineral estate does not mean the mineral estate owner no longer owns "land."

At the time he entered into the transaction with RCH, Huggins owned not only royalty interests and a possibility of reverter in the mineral estate he had previously leased to Union Pacific, but also an interest in all hard-core minerals contained within the tracts, which were specifically excepted from the Union Pacific leases. *See* Def.'s Mot. Summ. J. [#30-13] Ex. D-3 at 58, 62, 66, 70, 75, 79 (reserving all minerals other than "oil, gas, sulphur and associated liquid or liquefiable hydrocarbons," including coal, uranium, and other hard-core minerals, to Huggins). Consequently, Huggins had an ownership interest in the mineral estate—land—at the time he executed the Deed.

A final point: pursuant to the valid Deed, RCH presently owns Huggins's interest in the mineral estate included in the See–Yegua and See–Huggins Units.[4] Under the Deed, "in the event an existing oil, gas and mineral lease . . . becomes terminated, . . . then in that event, [RCH] . . . shall own all of [Huggins]'s right, title and interest in and to all of the oil, gas and other minerals in, under and that may be produced, saved and marketed from the Subject Land . . . ." Deed at 2.[5] Recall Huggins leased the mineral estate within the Units to Union Pacific in 1990 and 1991, retaining a

---

[4] The parties agree the Yegua-Yegua Unit is still held by production under the Union Pacific lease. *See* First Am. Compl. [#16] ¶ 32; Def.'s Answer & First Am. Countercls. [#26] ¶ 32.

[5] The parties agree the Deed is unambiguous. *See* Pl.'s Resp. [#32] at 1; Huggins Dep. at 29:16–22. Parol evidence is inadmissible to vary the terms of an unambiguous instrument. *See, e.g., Richardson v. Hart*, 185 S.W.2d 563, 564 (Tex. 1945).

possibility of reverter. *See, e.g.*, Def.'s Mot. Summ. J. [#30-13] Ex. D-3 at 60 (stating lease "shall be for a term of three (3) years . . . and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder").   When the See–Yegua and See–Huggins Units ceased to produce in September 2010 and June 2012, respectively, Union Pacific's leases of the minerals in those tracts terminated by operation of law. *See id.*; First Am. Compl. [#16] ¶¶ 30–31.   At that time, pursuant to the Deed, RCH became the fee owner of the minerals within the See–Yegua and See–Huggins Units.

The Court concludes the Deed properly conveyed Huggins's interests in land located in the Alfred Kennon Survey, A-32, Burleson County, Texas.   Consequently, RCH is entitled to summary judgment on Huggins's claims for "voidance of deed," quiet title, "termination of royalty interest held by RCH by operation of law," and unjust enrichment.

## B.   Reformation

Huggins next contends that even if the Deed is not voidable for an insufficient property description, it should be reformed due to mutual mistake.   According to Huggins, "the requisite mutual mistake consists of his unilateral mistake in signing a deed which did not conform to the parties' agreement and RCH's knowledge that the deed did not conform." Pl.'s Resp. [#32] at 14. RCH responds Huggins's claim is barred by limitations; Huggins claims the discovery rule applies to save his claim.   Huggins is incorrect.

A cause of action for reformation is subject to a four-year limitations period. TEX. CIV. PRAC. & REM. CODE § 16.051.   However, "[i]t is well settled in Texas that the limitations period for instrument reformation is subject to the discovery rule." *Harbor Ins. Co. v. Urban Constr. Co.*, 990 F.2d 195, 200 (5th Cir. 1993).   The discovery rule, in the context of reformation, defers accrual of

-11-

the cause of action until the party seeking reformation discovers, or should have discovered, the error or omission in the instrument. *Id.* (citing *Tucker v. Atl. Richfield Co.*, 787 S.W.2d 555, 558 (Tex. App.—Corpus Christi 1990, writ denied)). Further, the discovery rule applies only where the injury in question is both objectively verifiable and inherently undiscoverable. *Tipton v. Brock*, 431 S.W.3d 673, 677 (Tex. App.—El Paso 2014, pet. denied).

Assuming *arguendo* that Huggins did not discover the alleged errors in the Deed until some time within four years of filing suit, Huggins's claim would still fail, as his injury is not inherently undiscoverable. An injury is inherently undiscoverable if it is the type of injury not generally discoverable by the exercise of reasonable diligence; the undiscoverability requirement "'recognizes that the discovery rule exception should be permitted only in circumstances where it is difficult for the injured party to learn of the negligent act or omission.'" *Id.* (quoting *Computer Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)). The court decides whether the nature of an injury is inherently undiscoverable on a categorical rather than case-by-case basis. *Id.* (citing *Baleares Link Express, S.L. v. GE Engine Servs.—Dall., LP*, 335 S.W.3d 833, 837 (Tex. App.—Dallas 2011, no pet.)).

The Court finds Huggins's injury was not inherently undiscoverable. As the grantor, Huggins had some obligation to exercise reasonable diligence in protecting his interests. *Id.* (citing *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001)). Given, as Huggins agreed at deposition, that the Deed unambiguously expresses an intent to convey everything Huggins owned in the Alfred Kennon Survey (save the one-half interest in hard-core minerals), Huggins Dep. at

29:16–22,[6] any mistake in the Deed's granting language would not have been difficult for Huggins

to discover with the exercise of reasonable diligence. *See Tipton*, 431 S.W.3d at 680 ("A warranty

deed which clearly describes a reservation of mineral rights in contravention of the grantor's intent

is not the type of inherently undiscoverable injury contemplated by the discovery rule."); *cf.*

*Cosgrove v. Cade*, —S.W.3d—, 2015 WL 3976719, at *3 (Tex. 2015) ("A plainly evident omission

on an unambiguous deed's face is not a type of injury for which the discovery rule is available. . . .

At execution, the grantor is charged with immediate knowledge of an unambiguous deed's material

terms.").

As far as the Court can discern, Huggins argues his alleged injury was inherently

undiscoverable because RCH executed the EnerVest transfer order without change, received royalties

on the half-interest reflected in the transfer order, and in August 2013 and September 2014, sent

Huggins letters offering to purchase a royalty interest in the Yegua–Yegua Unit (obviously in error,

as Huggins conveyed that interest to RCH via the Deed). *See* Pl.'s Resp. [#32] at 15. None of these

reasons are relevant to the undiscoverability inquiry, as none concern the *inherent* undiscoverability

of the alleged injury; rather, all trend toward the type of case-by-case inquiry proscribed by Texas

law in the undiscoverability context. "Inherently undiscoverable" does not mean that a particular

plaintiff did not discover the injury within the limitations period. *Wagner & Brown*, 58 S.W.3d at

---

[6] Huggins testified:

Q. There was no ambiguity in that document in terms of the intent by you—in that document, as expressed in the mineral and royalty deed, was for you to convey everything that you owned, except for coal, in the Alfred Kennon Survey to Royalty Clearinghouse, correct?

A. That's right.

Huggins Dep. at 29:16–22.

735. As the discovery rule does not apply, Huggins's reformation claim is clearly untimely, and RCH is entitled to summary judgment on same.

## C.    Adverse Possession

In the alternative, Huggins claims he holds title by adverse possession, under both the three- and five-year Texas statutes of limitation, to "18.125% of 100% of" both the mineral and royalty interests at issue.  *See* First Am. Compl. [#16] at 23–24; TEX. CIV. PRAC. & REM. CODE §§ 16.024 (three years), 16.025 (five years).  Again, Huggins is incorrect.

Concerning the mineral estate, Huggins cannot satisfy the requirements for adverse possession because he has not actually possessed the minerals by drilling and producing oil or gas. "Adverse possession" is defined by Texas law as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person."  TEX. CIV. PRAC. & REM. CODE § 16.021(1).  When the real property in question is a mineral estate that has been severed from the surface estate, in order to mature title by limitations, actual possession of the minerals must occur.  *Natural Gas Pipeline Co. v. Pool*, 124 S.W.3d 188, 193 (Tex. 2003) (citing *Elliott v. Nelson*, 251 S.W. 501, 504 (Tex. 1923)).  Where the minerals in question are oil and gas, "that means drilling and production of oil or gas."  *Id.*  Huggins has neither drilled nor produced oil and gas from any of the Units; thus, his claim for adverse possession of the mineral estate fails.

As for the alleged adverse possession of the royalty interests,[7] having conveyed his royalty interests to RCH via the Deed, Huggins may not now invoke the three- or five-year statutes of

---

[7] The Court assumes *arguendo* that royalty interests may be adversely possessed in Texas.  *See Pounds v. Jurgens*, 296 S.W.3d 100, 107 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("As distinguished from a mineral interest, the royalty interest is a non-possessory interest.  The lessor's right to receive royalties is nevertheless considered an interest in real property and is taxable as such." (citing *Sheffield v. Hogg*, 77 S.W.2d 1021, 1024 (Tex. 1934))).

limitation to defeat the title he validly created. *See Voight v. Mackle*, 8 S.W. 623, 624 (Tex. 1888); *Morgan v. Baker*, 40 S.W. 27, 28 (Tex. Civ. App. 1897); 2 TEX. JUR. 3D ADVERSE POSSESSION §§ 127 ("A claimant may not invoke the [three-year] statute to defeat a right or interest that the claimant has created or transferred."), 142 ("A claimant who has executed a conveyance of the property is precluded from claiming title under a deed that predates that conveyance[.]"). RCH is entitled to summary judgment on Huggins's adverse possession claims.

### D.   "Ratification"

Finally, Huggins asserts a cause of action for "ratification" in the complaint, contending RCH "has ratified, confirmed and adopted the actions of Huggins in continuing to claim both the royalty and mineral rights" at issue. Ratification, however, is an equitable defense and may not be used to create a cause of action. *Greater Ft. Worth & Tarrant Cnty. Cmty. Action Agency v. Mims*, 627 S.W.2d 149, 151 (Tex. 1982). Huggins's affirmative ratification claim must therefore be dismissed.[8]

### E.   RCH's Counterclaims

In addition to its motion for summary judgment on Huggins's claims, RCH has moved for summary judgment on its counterclaims for breach of contract and, in the alternative, unjust enrichment.[9] Specifically, RCH contends Huggins (1) breached the Deed by claiming interests in the property despite conveying those interests to RCH and despite his promise in the Deed to warrant and defend RCH against others' claims to the interests conveyed, and (2) was and is unjustly

---

[8] Huggins's complaint also sets forth a cause of action for breach of the covenant of good faith and fair dealing. Huggins has since withdrawn that cause of action. *See* Pl.'s Resp. [#32] at 21.

[9] Huggins does not dispute that RCH's counterclaims were revived, to the extent necessary, by Huggins's suit. *See* TEX. CIV. PRAC. & REM. CODE § 16.069 (counterclaims which would be barred by limitations as a separate action are permitted where they arise from the same transaction or occurrence that is the basis of the plaintiff's action); Huggins Dep. at 103:5–15 (agreeing RCH's counterclaims are revived).

enriched by the royalty payments he has received and continues to improperly receive. RCH seeks actual damages of $27,657.69, the amount of all royalties incorrectly paid to Huggins since the Deed took effect through 2014, plus any royalties received in 2015 on the Yegua–Yegua Unit, plus prejudgment interest, post-judgment interest, costs, and attorney's fees. Unfortunately, in considering RCH's counterclaims, the Court lacks the benefit of full briefing by the parties, as Huggins has provided no substantive response to RCH's motion for summary judgment thereon.[10]

First, RCH's counterclaim for breach of contract is dismissed. A warranty deed is not a purchase contract; it is a conveyance, not a promise to convey. *See Bright v. Johnson*, 302 S.W.3d 483, 491–92 (Tex. App.—Eastland 2009, no pet.) (acknowledging the distinction between a purchase contract and a deed). In actuality, RCH's allegations sound not in breach of contract, but rather, in breach of the Deed's covenant of special warranty: RCH alleges Huggins breached by claiming interests in the property at issue despite his covenant to "WARRANT and FOREVER DEFEND all and singular the above described interest in and to the Subject Land unto [RCH] . . . against every person or party whomsoever lawfully claiming or to claim the same, or any part thereof, by, through, or under [Huggins], but not otherwise." Deed at 3. Lacking briefing from either party concerning an alleged breach of the covenant of special warranty, the Court declines to consider the issue. Accordingly, RCH's motion for summary judgment as to the breach-of-contract counterclaim is denied.

Turning to RCH's claim for unjust enrichment, the Court finds RCH is entitled to judgment. A party may recover under a theory of unjust enrichment when one person has obtained a benefit

---

[10] Huggins's one-sentence rebuttal to RCH's motion for summary judgment on its counterclaims reads: "Because these issues regarding [sic] contain facts for a jury, this should preclude a granting of this motion for summary judgment on same." Pl.'s Resp. [#32] at 21.

from another by fraud, duress, or the taking of an undue advantage; it is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits. *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied). Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one that it would be unconscionable to retain. *Stewart Title Guar. Co. v. Mims*, 405 S.W.3d 319, 339 (Tex. App.—Dallas 2013, no pet.). Huggins took undue advantage of the error in the EnerVest transfer order by retaining the royalty payments he erroneously received with full knowledge he had previously and validly conveyed his royalty interest in the Units to RCH via the Deed. Those royalty payments were and are RCH's property, and Huggins has profited at RCH's expense by retaining them. RCH is entitled to restitution for that wrong. *Cf. Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 692 (Tex. 1986) (explaining where an erroneous division order causes royalty payments to be mis-allocated, underpaid royalty owners can recover from overpaid royalty owners on the basis of unjust enrichment).

RCH has represented to the Court that Huggins has erroneously received $27,657.69 in royalties from November 1, 2007, the effective date of the Deed, through 2014. Huggins has not disputed that dollar figure. Accordingly, the Court awards RCH $27,657.69. RCH is also entitled to any and all royalties erroneously paid to Huggins in 2015 on production from the Yegua–Yegua Unit. As the record does not reflect that amount, the Court orders the parties to ascertain it and include it in their proposed judgment.

### i. Prejudgment Interest

Finally, RCH asks the Court to award prejudgment interest. In this diversity case, state law governs an award of prejudgment interest. *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d

1048, 1057 (5th Cir. 1996). The two potential legal sources for a prejudgment interest award under Texas law are (1) general principles of equity and (2) an enabling statute. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998). Equitable prejudgment interest "is awarded as a matter of course when the trier of fact finds that damages accrued before the time of judgment, and such an award is not generally a matter for the trial court's discretion." *Bituminous Cas. Corp.*, 75 F.3d at 1057 (internal quotes and cites omitted). "'Under Texas law an equitable award of prejudgment interest should be granted to a prevailing party in all but exceptional circumstances.'" *Id.* (quoting *Am. Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 541 (5th Cir. 1987)). In Texas, prejudgment interest accrues beginning either on the 180th day after the defendant received written notice of the claim or on the date the suit was filed, whichever occurs first. *Johnson & Higgins*, 962 S.W.2d at 531. The prejudgment interest rate is equal to the post-judgment interest rate applicable at the time of judgment, and the current rate for post-judgment interest in Texas is 5% per annum. *See* TEX. FIN. CODE §§ 304.103, 304.003(c)(2). Prejudgment interest is computed as simple interest. *Johnson & Higgins*, 962 S.W.2d at 532.

There is no evidence in the record indicating Huggins received notice of RCH's counterclaims against him prior to the date RCH filed its answer and counterclaims in this lawsuit. Consequently, the Court concludes prejudgment interest began to accrue on the date RCH filed its counterclaim: December 22, 2014. *See* Def.'s Answer & Countercls. [#5]; *Strategic Capital Corp. v. New Strong Grp. Ltd.*, No. 4:08-CV1651, 2012 WL 6202182, at *13 (S.D. Tex. Dec. 12, 2012) (applying Texas law and finding prejudgment interest on counterclaim began to accrue on the date the counterclaim was filed). As the amount of royalties erroneously paid to Huggins in 2015 is not reflected in the record, the Court orders the parties to include in their proposed judgment the amount

-18-

of prejudgment interest owed on the $27,657.69 in royalties paid from 2007–2014, plus that owed on the 2015 royalties.

## Conclusion

Huggins validly conveyed to RCH all of his mineral and royalty interests in the Units, save the hard-core mineral interests not at issue in this suit.  Further, as provided in the Deed, upon expiration of the Union Pacific leases, the interests covered under those leases became the property of RCH.  Huggins's claims lack a basis in law, and appear to the Court to be little more than a disingenuous attempt to capitalize on an administrative error.  RCH is entitled to summary judgment both on Huggins's claims and on its counterclaim for unjust enrichment.

Accordingly:

IT IS ORDERED that Defendant Royalty Clearinghouse, Ltd.'s counterclaim for breach of contract is DISMISSED;

IT IS FURTHER ORDERED that Defendant Royalty Clearinghouse, Ltd.'s Motion for Summary Judgment [#30] is DENIED as to the counterclaim dismissed above and GRANTED in all other respects;

IT IS FURTHER ORDERED that Plaintiff William O. Huggins's Motion for Partial Summary Judgment [#24] is DENIED; and

IT IS FINALLY ORDERED that the parties jointly submit, within fourteen (14) days from date of entry of this order, a proposed judgment consistent with this opinion setting forth the damages to which Defendant Royalty Clearinghouse is entitled, including the $27,657.69 in royalties erroneously paid to Plaintiff through 2014, the amount of royalty erroneously paid to Plaintiff in 2015, and the prejudgment and post-judgment interest to

which Defendant is entitled, with Plaintiff to bear all costs of suit.  The Court will entertain

a motion for attorney's fees following entry of judgment.

SIGNED this the _31st_ day of July 2015.


_Sam Sparks_

SAM SPARKS
UNITED STATES DISTRICT JUDGE